FILED - USDC - FLMD - TPA

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF FLORIDA

**TAMPA DIVISION**

8:26-CV-1962-JLB-TGW

**AUDRA M. MULLINS,**

Plaintiff,

v.

**UDR, INC.,** a Delaware corporation,

Defendant.

Case No. _____

# COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Audra M. Mullins ("Plaintiff"), proceeding pro se, alleges the following against Defendant UDR, Inc. ("UDR" or "Defendant"):

## I. NATURE OF THE ACTION

1. This is an action for employment discrimination, retaliation, hostile work environment, and disability discrimination arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.
2. Plaintiff was employed by Defendant as an After Hours Emergency Maintenance Call Center Technician from approximately October 2, 2024, until her termination on August 5, 2025.
3. Plaintiff alleges that, after the first weeks of her employment, her direct supervisor, Javier Garcia, subjected her to repeated hostile and demeaning treatment, questioned her competence, criticized her in a manner different from similarly situated coworkers, and treated her as though she lacked the ability to perform her job despite Plaintiff's efforts to perform her duties and improve her performance.



4. Plaintiff repeatedly attempted to resolve these concerns through Defendant's internal reporting procedures. Plaintiff reported her concerns to Human Resources, requested management intervention, requested transparency in communications, requested that one-on-one meetings include another management representative, and sought to repair the working relationship with Mr. Garcia through direct communication.

5. Rather than resolving Plaintiff's concerns, Plaintiff alleges that Defendant escalated disciplinary action after Plaintiff engaged in protected activity, created a formal disciplinary record, and ultimately terminated Plaintiff's employment.

6. Plaintiff further alleges that Defendant treated similarly situated employees outside Plaintiff's protected classes more favorably with respect to discipline and supervision, and that Defendant terminated Plaintiff for reasons that were pretextual rather than the true reasons for its actions.

7. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race, color, sex, national origin, disability (regarded as disabled), and retaliation. The EEOC issued a Dismissal and Notice of Rights on April 10, 2026, which Plaintiff received by email the same day. This action is filed within the applicable ninety-day period following receipt of the Notice.

## II. JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States, including Title VII and the ADA.

9. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391 because Plaintiff worked remotely from Florida during her employment, and a substantial part of the events giving rise to Plaintiff's claims occurred within this District.

10. Plaintiff exhausted her administrative remedies by filing a timely Charge of Discrimination with the EEOC before commencing this action.

## III. PARTIES

11. Plaintiff Audra M. Mullins is an adult resident of Polk County, Florida.

12. Defendant UDR, Inc. is a Delaware corporation that conducts business throughout the United States and, at all relevant times, employed the number of employees necessary to qualify as an employer under Title VII and the ADA.

13. At all relevant times, Plaintiff was employed by Defendant as an After Hours Emergency Maintenance Call Center Technician.

14. Plaintiff reported directly to Javier Garcia, After Hours Maintenance Call Center Supervisor.

15. Daniel Thorp served as National Director of Facilities and exercised supervisory authority over Plaintiff's department and over Mr. Garcia.

16. Susan Meader served as Human Resources Manager and participated in meetings concerning Plaintiff's complaints regarding Mr. Garcia and Plaintiff's continued employment.

## IV. ADMINISTRATIVE EXHAUSTION

17. Plaintiff filed EEOC Charge No. 511-2026-01851 alleging discrimination based on race, color, sex, national origin, disability (regarded as disabled), and retaliation.
18. The EEOC issued Plaintiff a Dismissal and Notice of Rights on April 10, 2026.
19. Plaintiff received the Notice by email on April 10, 2026.
20. Plaintiff has timely commenced this action within ninety (90) days after receipt of the EEOC's Notice of Right to Sue.

## V. FACTUAL BACKGROUND

### A. Plaintiff's Employment

21. Plaintiff began employment with Defendant on October 2, 2024, as an After Hours Emergency Maintenance Technician. Plaintiff performed the essential duties of that position remotely, assisting residents with after-hours maintenance emergencies and dispatching maintenance personnel in accordance with Defendant's procedures.
22. Plaintiff worked remotely from Polk County, Florida, while performing services for Defendant.
23. Plaintiff reported directly to Javier Garcia, After Hours Maintenance Call Center Supervisor.
24. Plaintiff accepted employment with Defendant intending to establish a long-term career and believed Defendant offered opportunities for professional advancement.
25. Plaintiff successfully completed Defendant's training program approximately three weeks earlier than anticipated. Shortly thereafter, Defendant authorized Plaintiff to work overtime, demonstrating that Plaintiff was considered capable of performing the duties of the position.
26. Throughout her employment, Plaintiff treated residents professionally, attempted to resolve maintenance emergencies efficiently, and sought clarification whenever she believed additional instruction was necessary.
27. Plaintiff remained committed to improving her performance and preserving her employment throughout the events described in this Complaint.

### B. Change in Treatment by Plaintiff's Supervisor

28. During Plaintiff's first week of employment, Plaintiff alleges that Mr. Garcia questioned her about her family and background and that Plaintiff believed she was treated differently because of her race, color, sex, and national origin. Plaintiff alleges that coworkers outside her protected classes were not subjected to the same pattern of

scrutiny and discipline for comparable workplace conduct. Plaintiff was uncomfortable discussing personal matters unrelated to her employment and attempted to keep conversations focused on work.

29. Beginning during Plaintiff's second week of employment, Plaintiff alleges that her immediate supervisor, Javier Garcia, began treating her differently than other employees assigned to the same department. Plaintiff alleges that Mr. Garcia repeatedly subjected her to hostile one-on-one meetings, spoke to her in a demeaning manner, questioned her competence, and frequently reduced her to tears. Plaintiff contemporaneously documented many of these incidents through notes, text messages, emails, and screenshots.

30. Plaintiff alleges that Mr. Garcia repeatedly questioned her ability to understand routine work assignments, referred to her as "slow," and otherwise treated her as though she lacked the mental capacity to perform her job despite her successful performance, completion of training early, and working over time. Plaintiff contends that this treatment contributed to Defendant regarding her as if she had a mental impairment.

31. Plaintiff nevertheless continued performing her duties, sought additional guidance when necessary, and attempted to improve wherever Defendant identified concerns.

32. Plaintiff alleges that Mr. Garcia made comments suggesting that Plaintiff lacked the ability to perform routine job duties, despite Plaintiff's continued efforts to perform those duties successfully. Mr. Garcia acknowledged his treatment of the Plaintiff was discriminatory and different from how he treated his other subordinates, and on several occasions he told the Plaintiff that no one should be talked to like that, that he wouldn't be surprised if Plaintiff went to HR about his conduct, and on two more separate occasions Mr. Garcia informed the Plaintiff that he would turn himself into HR due to the way that he had spoken to the Plaintiff.

33. Plaintiff alleges that these interactions occurred repeatedly throughout her employment and caused Plaintiff to become increasingly concerned about her job security. Plaintiff repeatedly attempted to resolve the workplace issues internally. She requested that future one-on-one meetings include another manager, and requested permission to record meetings. Defendant acknowledged that Plaintiff's complaints were valid and granted Plaintiff's requests. Mr. Garcia had also turned himself in to HR, as he had previously told the Plaintiff that he would, and on April 2, 2025, Plaintiff was able to formerly seek assistance from Human Resources, and raised her concerns directly with Human Resource Manager, Ms. Susan Meader in a Microsoft Teams meeting. Defendant confirmed and continued to grant Plaintiff's requests that included another manager be present during meetings with Mr. Garcia, that those meetings be recorded, and that Mr. Garcia otherwise only speaks with the Plaintiff in Microsoft Teams chat using the group chat.

34. Mr. Garcia's conduct worsened, and on June 3, 2025, Plaintiff met with National Director Daniel Thorp and Human Resources Manager Susan Meader to further discuss her allegations.

## C. Plaintiff's Good-Faith Efforts to Resolve Workplace Issues

35. Rather than ignoring the problems she experienced, Plaintiff repeatedly attempted to resolve them through Defendant's internal reporting procedures.

36. After her ninety days had passed, and after she had proven that she was a "good fit" according to her performance, and during another one on one in which Mr. Garcia informed Plaintiff that he would turn himself into HR, Plaintiff requested that one-on-one meetings include another management representative because she believed Mr. Garcia treated her differently during private conversations. Mr. Garcia consented to Plaintiff's requests.

37. After the first one on one with a third party, Plaintiff requested permission to record meetings in order to preserve an accurate record of discussions concerning her employment.

38. Plaintiff also requested that work-related questions and communications occur through the team Microsoft Teams chat so that communications would be transparent and available to the entire team. Plaintiff's requests were granted.

39. Plaintiff alleges that management approved or implemented these various communication safeguards, including discussions concerning third-party participation during meetings and the use of team communications in response to Plaintiff's concerns.

40. Plaintiff also sought assistance from Human Resources and from Daniel Thorp, National Director of Facilities, in an effort to resolve the ongoing workplace issues.

41. Plaintiff's objective throughout these efforts was to preserve her employment, improve communication, and perform her job successfully rather than create conflict with management.

## D. Plaintiff's Internal Complaints and Defendant's Response

42. As the conduct described above continued and worsened, Plaintiff repeatedly sought assistance through Defendant's internal reporting procedures rather than ignoring the issues or engaging in workplace conflict.

43. Plaintiff further escalated and communicated her concerns to Susan Meader, Human Resource Manager, and to upper management, including Daniel Thorp, National Director of Facilities. On or about April 2, 2025, Plaintiff met with Human Resources Manager Susan Meader. On June 3, 2025, Plaintiff participated in a formal meeting with National Director Daniel Thorp and Human Resources Manager Susan Meader regarding her allegations of discrimination and hostile work environment by Mr. Garcia. During that meeting Plaintiff specifically complained that she had been treated differently from other employees and described repeated hostile interactions with Mr. Garcia.

44. Plaintiff reported that Mr. Garcia repeatedly criticized, belittled, and intimidated her during private conversations and one-on-one meetings and that his conduct was affecting her ability to perform her job and her emotional well-being.

45. Plaintiff requested that future meetings with Mr. Garcia include another management representative or witness because she no longer felt comfortable meeting with him alone.

46. Plaintiff also requested permission to record meetings concerning her employment so that an accurate record would exist regarding discussions affecting her job.

47. Plaintiff further requested that work-related questions and instructions be communicated through the team Microsoft Teams chat whenever practical so that communications would be transparent and available to the entire team.

48. On or about April 2, 2025, Plaintiff met with Human Resources Manager Susan Meader and Mr. Garcia to discuss Plaintiff's concerns regarding Mr. Garcia's conduct.

49. During that meeting, Plaintiff alleges that the discussion focused primarily on Plaintiff's conduct and what Plaintiff had done to contribute to or cause the conflict rather than addressing Plaintiff's complaints regarding Mr. Garcia's conduct and treatment of her.

50. Following that meeting, Plaintiff remained committed to preserving her employment and improving the working relationship with Mr. Garcia.

51. On or about April 4, 2025, Plaintiff sent Mr. Garcia an email expressing her sincere desire to repair their professional relationship, improve communication, identify any mistakes she may have made, and continue her employment with Defendant.

52. In that email, Plaintiff advised Mr. Garcia that the ongoing conflict had caused her significant stress both at work and outside of work and requested that management work with her to improve the workplace relationship.

53. Mr. Garcia responded by thanking Plaintiff for reaching out, acknowledging her desire to improve the situation, expressing that the work environment and professional relationships were important to him, and stating that he shared Plaintiff's goal of finding a constructive path forward.

54. Plaintiff alleges that, despite these assurances, the conduct about which she had complained did not improve and instead continued.

55. On or about June 3, 2025, Plaintiff met with Daniel Thorp and Susan Meader to further discuss her concerns regarding Mr. Garcia's conduct and her work environment.

56. During that meeting, Plaintiff described repeated instances in which she believed Mr. Garcia treated her differently during private conversations, questioned her competence, and created an intimidating and hostile work environment to the extent that Mr. Garcia stated that he would turn himself into HR.

57. During that meeting, Mr. Thorp acknowledged that Mr. Garcia had previously informed him that Mr. Garcia had acted unprofessionally toward Plaintiff and intended to report himself to Human Resources regarding his conduct. Plaintiff alleges that this acknowledgment demonstrated Defendant's awareness that concerns existed regarding Mr. Garcia's treatment of Plaintiff.

58. During that meeting, Defendant's management discussed continuing the practice of having another person present during conversations between Plaintiff and Mr. Garcia and confirmed and further discussed Plaintiff's request that work-related communications occur in the team Microsoft Teams chat, and that someone would speak with Mr. Garcia regarding his conduct.

59. Plaintiff alleges that despite her complaints, Defendant failed to take effective corrective action. Instead, Plaintiff contends that Defendant subjected her to escalating discipline, including a documented verbal warning on March 10, 2025, and later a Final Written Warning on July 10, 2025, which Plaintiff alleges were based on selectively enforced standards and inaccurate characterizations of her work performance. Plaintiff repeatedly

requested an explanation for the verbal warning and the Final Written Warning, but her requests were ignored.

60. Plaintiff maintains that similarly situated coworkers committed comparable workplace errors but were not disciplined to the same extent or not disciplined at all. Plaintiff documented numerous examples of these alleged disparities through Microsoft Teams communications, emails, and other business records maintained during her employment.

61. Plaintiff alleges that, despite her repeated good-faith efforts to resolve these issues internally, Defendant failed to correct the conduct and instead later escalated disciplinary action against Plaintiff in retaliation.

## E. Escalation of Discipline Following Plaintiff's Protected Complaints

62. Plaintiff alleges that, after repeatedly reporting her concerns to Human Resources and upper management, Defendant's disciplinary actions against her increased in frequency and severity.

63. Prior to Plaintiff's internal complaints, Mr. Garcia primarily addressed perceived concerns through verbal coaching or warnings.

64. After Plaintiff engaged in protected activity by reporting what she believed to be discrimination, retaliation, and a hostile work environment, Plaintiff alleges that Defendant began creating a formal disciplinary record against her.

65. On or about June 23, 2025, Plaintiff sent a message in the team Microsoft Teams chat comparing the number of calls she had handled that day with the number handled by Mr. Garcia. Plaintiff believed her productivity demonstrated that she had been working diligently and hoped her efforts would be recognized.

66. Mr. Garcia responded by instructing Plaintiff to work on completing the nightly document, and Plaintiff replied, "I will lol."

67. Plaintiff alleges that this exchange was later characterized by Defendant as insubordination, although Plaintiff believed her comments were respectful, work-related, and intended to demonstrate her increased productivity rather than challenge supervisory authority.

68. Plaintiff alleges that similarly situated employees were not subjected to comparable formal discipline for similar workplace communications or performance-related issues.

69. Plaintiff further alleges that other employees, including Dustin Crager and Yakob Kassa, made work-related mistakes without receiving the same level of formal discipline imposed upon Plaintiff. Plaintiff intends to present evidence supporting these allegations during the course of this litigation.

70. On or about July 10, 2025, Defendant issued Plaintiff a Final Written Warning alleging violations of company policy based on call-handling procedures and Microsoft Teams communications.

71. Plaintiff disputes Defendant's characterization of her conduct and alleges that the disciplinary actions issued after her protected complaints were inconsistent with her actual performance and were used to create a record supporting Defendant's eventual decision to terminate her employment.

72. Plaintiff further alleges that Defendant applied workplace policies more harshly to her than to similarly situated employees outside her protected classes.

## F. Plaintiff's Termination

73. On August 5, 2025, Defendant terminated Plaintiff's employment during a Microsoft Teams meeting attended by Plaintiff, Human Resources Manager Susan Meader, and Javier Garcia. During the meeting, Plaintiff repeatedly requested an explanation for the termination and asked for the reason in writing. Defendant declined to provide a specific reason and instead stated that Plaintiff was "not a good fit" and referred generally to "ongoing issues."

74. During the termination meeting, Defendant offered Plaintiff the opportunity to resign instead of being terminated, and explained that a resignation would provide certain benefits including at least two weeks of additional pay, payment for accrued paid time off, all of the Plaintiff's accrued 401k, the opportunity to reapply with the Defendant at a different location, and a more favorable employment record within Defendant's system. Plaintiff also requested a copy of the recorded meeting for her attorneys. Defendant acknowledged that the meeting had been recorded.

75. Plaintiff alleges that the disciplinary actions and termination were motivated, in whole or in part, by unlawful discrimination and retaliation, rather than by legitimate performance concerns.

76. Plaintiff declined to resign because she believed she had not engaged in misconduct warranting the loss of her employment.

77. Plaintiff alleges that Defendant's stated reasons for disciplinary actions and termination were motivated, in whole or in part, by unlawful discrimination and retaliation, rather than by legitimate performance concerns, after months of protected complaints, escalating discipline, and unsuccessful attempts to resolve the issues through Defendant's internal processes.

## G. Plaintiff's Damages

78. As a direct and proximate result of Defendant's actions, Plaintiff lost wages, employment benefits, and employment reputation, following her termination.

79. Plaintiff was able to acquire more income by obtaining new employment in approximately January 2026 at a lower rate of pay.

80. Plaintiff alleges that Defendant's actions caused her emotional distress, anxiety, humiliation, and loss of self-esteem. Plaintiff also alleges that the stress associated with Defendant's conduct adversely affected her physical well-being.

81. Plaintiff continues to suffer economic and non-economic damages for which she seeks all relief authorized by law.

# COUNT I

**Title VII of the Civil Rights Act of 1964**

**Disparate Treatment Based on Race, Sex, and National Origin**

82. Plaintiff realleges and incorporates by reference Paragraphs 1 through 81 as though fully set forth herein.
83. At all relevant times, Plaintiff was a member of protected classes based on her race, sex, and national origin.
84. Plaintiff was qualified for her position as an After Hours Emergency Maintenance Call Center Technician and performed the essential functions of her position.
85. Plaintiff alleges that she was subjected to disparate treatment in the terms and conditions of her employment, including heightened scrutiny, repeated criticism, escalating discipline, and termination.
86. Plaintiff alleges that similarly situated employees outside one or more of her protected classes committed comparable workplace errors but were not subjected to the same level of discipline or adverse treatment.
87. Plaintiff identifies, among others, Dustin Crager and Yakob Kassa as employees whom she observed making work-related mistakes that, to Plaintiff's knowledge, did not result in discipline comparable to that imposed upon Plaintiff.
88. Plaintiff further alleges that her supervisor's treatment toward her changed early in her employment and that he repeatedly questioned her competence, criticized her work performance in a manner different from similarly situated employees, and subjected her to heightened scrutiny.
89. Plaintiff alleges that Defendant's stated reasons for disciplining and terminating her were not the true reasons for its actions but were a pretext for unlawful discrimination.
90. As a direct and proximate result of Defendant's actions, Plaintiff suffered lost wages, lost employment benefits, emotional distress, and other damages recoverable under Title VII.

WHEREFORE, Plaintiff respectfully requests judgment against Defendant on Count I and all relief authorized by law, including back pay, front pay or reinstatement if appropriate, compensatory damages, punitive damages to the extent permitted by law, costs, pre- and post-judgment interest where authorized, and such other relief as the Court deems just and proper.

# COUNT II

**Americans with Disabilities Act**

**Disability Discrimination – Regarded As Disabled**

(42 U.S.C. § 12112)

91. Plaintiff incorporates by reference Paragraphs 1 through 90 as though fully set forth herein.

92. Plaintiff did not have an actual mental disability during her employment with Defendant and did not request a reasonable accommodation under the Americans with Disabilities Act.

93. Plaintiff alleges that Defendant, through its managers and supervisors, regarded Plaintiff as having a mental impairment and treated Plaintiff differently because of that perceived impairment.

94. Throughout Plaintiff's employment, Mr. Garcia repeatedly questioned Plaintiff's competence, referred to Plaintiff as being "slow," questioned whether Plaintiff knew what she was doing or where she was supposed to go, and, according to Plaintiff, treated her as though she lacked the ability to perform routine aspects of her position despite her continued efforts to perform successfully.

95. Plaintiff further alleges that Mr. Garcia made statements and engaged in conduct that caused Plaintiff to believe Defendant regarded her as lacking the mental capacity to perform her job, including criticism directed at her ability to understand instructions and complete routine work tasks.

96. Plaintiff alleges that Defendant subjected her to heightened scrutiny, increased discipline, and ultimately terminated her employment because of Defendant's perception of Plaintiff's abilities rather than Plaintiff's actual job performance.

97. Plaintiff alleges that Defendant's stated reasons for disciplining and terminating Plaintiff were not the true reasons for its actions and were instead a pretext for unlawful discrimination.

98. As a direct and proximate result of Defendant's actions, Plaintiff suffered lost wages, lost employment benefits, emotional distress, humiliation, and other damages recoverable under the Americans with Disabilities Act.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant on Count II and award all relief authorized by the Americans with Disabilities Act, including back pay, front pay or reinstatement if appropriate, compensatory damages, costs, pre- and post-judgment interest where authorized, and such further relief as the Court deems just and proper.

# COUNT III

## Title VII Retaliation

(42 U.S.C. § 2000e-3)

99. Plaintiff incorporates by reference Paragraphs 1 through 98 as though fully set forth herein.

100. Plaintiff engaged in protected activity by repeatedly making good-faith complaints to Defendant's management and Human Resources concerning what Plaintiff believed to be discriminatory treatment and a hostile work environment.

101.    Plaintiff also engaged in protected activity by requesting intervention from Human Resources, requesting that meetings include another management representative, requesting permission to record meetings, requesting greater transparency in work communications, and escalating her concerns to Daniel Thorp, National Director of Facilities.

102.    Defendant was aware of Plaintiff's protected activity.

103.    After Plaintiff engaged in protected activity, Defendant increased the frequency and severity of disciplinary actions taken against Plaintiff.

104.    Plaintiff alleges that the timing of the increased discipline, together with the surrounding circumstances, supports an inference that Defendant retaliated against Plaintiff because she engaged in protected activity.

105.    Defendant ultimately terminated Plaintiff's employment on August 5, 2025.

106.    Plaintiff alleges that Defendant's stated reasons for the disciplinary actions and termination were pretextual and that the real reason included retaliation for Plaintiff's protected complaints.

107.    As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff suffered lost wages, lost employment benefits, emotional distress, and other damages recoverable under Title VII.

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendant on Count III and all relief authorized by Title VII, including back pay, front pay or reinstatement if appropriate, compensatory damages, punitive damages where permitted by law, costs, pre- and post-judgment interest where authorized, and such other relief as the Court deems just and proper.

# COUNT IV

## Hostile Work Environment

(Title VII of the Civil Rights Act of 1964)

108.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 107 as though fully set forth herein.

109.    Plaintiff alleges that, throughout her employment, she was subjected to repeated unwelcome conduct by her supervisor, Javier Garcia, including belittling comments, repeated questioning of her competence, heightened scrutiny, intimidation during work-related interactions, and treatment that differed from similarly situated employees.

110.    Plaintiff alleges that she repeatedly complained to Human Resources and upper management regarding this conduct and requested intervention to prevent further mistreatment.

111.    Plaintiff further alleges that Defendant failed to take effective corrective action despite being placed on notice of her complaints.

112.    Plaintiff alleges that the conduct became sufficiently frequent and pervasive that it altered the conditions of her employment, interfered with her ability to perform her work, and caused emotional distress.

113.    Plaintiff alleges that the hostile work environment was connected to the protected characteristics and protected activity described elsewhere in this Complaint.

114.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered emotional distress, humiliation, anxiety, loss of enjoyment of life, and other compensable damages.

WHEREFORE, Plaintiff requests judgment in her favor on Count IV and all relief available under Title VII.

---

# COMMON FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

115.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

116.    Throughout Plaintiff's employment, Defendant maintained that Plaintiff's alleged performance deficiencies justified increasingly severe disciplinary action.

117.    Plaintiff denies Defendant's allegations of poor performance and alleges that she satisfactorily performed the essential functions of her position.

118.    Plaintiff further alleges that Defendant repeatedly praised aspects of her work, including permitting Plaintiff to complete training early, approving overtime shortly after training, and continuing her employment for several months while simultaneously subjecting her to increasingly severe scrutiny.

119.    Plaintiff alleges that Defendant selectively enforced workplace policies against her while failing to impose comparable discipline upon similarly situated employees who committed comparable or more serious errors. Plaintiff documented numerous examples of those incidents through Microsoft Teams messages, emails, call logs, screenshots, and contemporaneous notes.

120.    Plaintiff repeatedly sought clarification concerning workplace expectations and requested opportunities to discuss disciplinary actions that she believed were inaccurate or misleading.

121.    Plaintiff alleges that Defendant failed to provide meaningful explanations for disciplinary decisions and failed to fairly investigate Plaintiff's complaints of discrimination and retaliation.

122.    Plaintiff further alleges that after she complained internally of discrimination, Defendant's treatment became increasingly adverse, culminating in written discipline and termination.

123.   Plaintiff alleges that Defendant's stated reasons for disciplining and terminating her were false, inconsistent, exaggerated, selectively enforced, or otherwise not the true reasons for its employment decisions.

124.   Plaintiff alleges that discrimination and retaliation were motivating factors in Defendant's adverse employment actions.

## DAMAGES

125.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered substantial damages.

126.   Plaintiff has sustained lost wages, lost employment benefits, lost earning capacity, and other economic damages.

127.   Plaintiff has also suffered emotional distress, embarrassment, humiliation, anxiety, inconvenience, and damage to her professional reputation as a result of Defendant's conduct.

128.   Plaintiff continues to suffer damages and will continue to incur damages unless Defendant is held liable under the applicable federal statutes.

## EXHIBITS

- **Exhibit A – EEOC Charge of Discrimination.**
- **Exhibit B – EEOC Notice of Right to Sue.**
- **Exhibit C – March 11, 2025 Documented Verbal Warning.**
- **Exhibit D – June 3, 2025 transcript of meeting with Daniel Thorp and Susan Meader.**
- **Exhibit E – July 10, 2025 Final Written Warning.**
- **Exhibit F – August 5, 2025 termination meeting transcript.**
- **Exhibit G – Chronology and supporting documentation (or selected excerpts, if the full chronology is not attached).**

## CONDITIONS PRECEDENT

129. Plaintiff has satisfied all administrative prerequisites required before filing this action.

130. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging discrimination based upon race, color, sex, national origin, retaliation, and disability arising from Defendant's conduct.

131. The EEOC assigned Charge Number 511-2026-01851 to Plaintiff's administrative charge.

132. On April 10, 2026, the EEOC issued Plaintiff a Determination and Notice of Rights advising Plaintiff of her right to file a civil action within ninety (90) days after receipt of the Notice.

133. Plaintiff received the Notice of Right to Sue on or about April 10, 2026.

134. This civil action is timely filed within the statutory ninety-day filing period.

# JURISDICTION AND VENUE

135. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

136. This Court also has jurisdiction pursuant to 42 U.S.C. § 2000e-5(f)(3) and 42 U.S.C. § 12117 because Plaintiff seeks relief under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act.

137. Venue is proper in the Middle District of Florida pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 because the unlawful employment practices alleged herein occurred within this judicial district and Plaintiff worked within this District during her employment with Defendant.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant and grant the following relief:

1. Declare that Defendant violated Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act;

2. Award Plaintiff back pay, lost wages, lost employment benefits, bonuses, retirement benefits, and all other economic losses caused by Defendant's unlawful conduct;

3. Award front pay or reinstatement if the Court determines reinstatement to be appropriate;

4. Award compensatory damages as authorized by law;
5. Award punitive damages if supported by the evidence and permitted under applicable law;
6. Award prejudgment and post-judgment interest;
7. Award costs of this action and attorney's fees if Plaintiff later retains counsel and such fees are recoverable by statute;
8. Grant declaratory and injunctive relief as the Court considers appropriate; and
9. Award such other and further relief as the Court deems just and proper.

# DEMAND FOR JURY TRIAL

**Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.**

## Respectfully submitted,

*[signature]* 07/09/2026

**Audra Mullins**
**Plaintiff, Pro Se**

**621 Kansas Avenue**

**Lakeland, FL 33815**

**863-937-2565**

**audramullins17@gmail.com**

EEOC No. 511-2026-01851 | FEPA No.

# CHARGE OF DISCRIMINATION

Form 5 (06/24)

This form is affected by the Privacy Act of 1974.
See attached Privacy Act Statement and other information before completing this form.

| CHARGE PRESENTED TO: | AGENCY CHARGE NO. |
| --- | --- |
| EEOC | 511-2026-01851 |
| Florida Commission On Human Relations | |

Name *(indicate Mr., Ms., Mrs., Miss, Dr., Hon., Rev.)*: Ms. Audra M. Mullins

Phone No.:       (863) 937-2565
Year of Birth:      1981
Mailing Address: 621 Kansas Avenue
LAKELAND, FL 33815

Named below is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency that I believe discriminated against me or others.

Name: UDR, Inc.
No. Employees, Members: 501+ Employees
Phone No.:
Mailing Address: 1745 SHEA CENTER DRIVE, SUITE 200
HIGHLANDS RANCH, CO 80129, UNITED STATES OF AMERICA
Name:
No. Employees, Members:
Phone No.:
Mailing Address:

## DISCRIMINATION BASED ON:

Color, Disability, National Origin, Race, Retaliation, Sex

## DATE(S) DISCRIMINATION TOOK PLACE

Earliest: 10/02/2024
Latest: 08/06/2025

## THE PARTICULARS ARE:

I was hired on October 2, 2024, by UDR, Inc. as a After Hours Emergency Maintenance Technician.

I was subjected to discrimination mainly by supervisor Javier Garcia. Javier would ask me frequently about my family and background. Javier and other staff would talk to me like I was a child. I further believe I was discriminated against because of my National Origin-American (U.S.) because Javier was from Mexico and treated me differently.

I have several screenshots of how I was treated inside of Microsoft Teams chat, how I was treated in a few recorded conversations, including one in which Mr. Daniel Thorp confirmed that Javier had treated me so badly that Javier had confessed this behavior to Mr. Thorp and told Mr. Thorp that he would take himself to HR. Instead, Javier continued to discriminate against me, though I asked for help multiple times and in multiple ways. The discrimination had gotten so bad that I had to request to not have one-on-one meeting with Javier alone, and to record all meetings going forward, which is why I have Mr. Daniel Thorp on recording stating what Javier had told him and I told Mr. Thorp in that recorded MS Teams meeting everything that I have told you all about which is outlined in this case. Thank you, I really appreciate you taking out the time to look into this.

EEOC No. 511-2026-01851 | FEPA No.

I also believe I was regarded as disabled because of a perceived mental disability. Javier would often call me slow.

I believe for the reasons listed above I was treated differently, suffered unfair discipline, and would be fired because of Javier's discriminatory nature towards me.

I was discharged from UDR on August 6, 2025.

I believe I have been discriminated and retaliated against because of my National Origin-American (U.S.) Origin, Color, Sex-Female, and Race-Black/African American, in violation of the Title VII, as amended, and all applicable state statutes.

I further believe I have been discriminated against because of being regarded as disabled, in violation of the Americans with Disabilities Act (ADA), as amended, and all applicable state statutes.

EEOC No. 511-2026-01851 | FEPA No.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct, and that I have read each page of this form.

Digitally Signed By: Ms. Audra M. Mullins
03/31/2026

Charging Party Signature & Date

If a state or local Fair Employment Practices Agency (FEPA) requires notarization, you may need to sign the charge in the presence of a notary. If so, please do so here.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

Notarized Signature of Charging Party

Subscribed and sworn to before me this date:

Signature of Notary_____

Printed Name _____

## CP ENCLOSURE WITH EEOC FORM 5 (06/24)

### PRIVACY ACT STATEMENT

Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (06/24).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so *within 15 days* of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA, Section 207(f) of GINA, and 42 USC 2000gg-2(f)(1) of the PWFA it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

*Exhibit B*



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Tampa Field Office**
501 East Polk St, Suite 1000
Tampa, FL 33602
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

**To:** Ms. Audra M. Mullins
621 Kansas Avenue
LAKELAND, FL 33815

Charge No: 511-2026-01851

EEOC Representative and email:     MICHAEL SUAREZ
INVESTIGATOR
MICHAEL.SUAREZ@EEOC.GOV

### DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 511-2026-01851.

On behalf of the Commission,

*Tamra S Schweiberger*
Digitally signed by Tamra
Schweiberger
Date: 2026.04.10 12:11:59 -04'00'

Tamra S. Schweiberger
Director

Cc:
UDR, Inc.
621 Kansas Avenue
LAKELAND, FL 33815

Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 511-2026-01851 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500, Miami, FL 33131.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 511-2026-01851 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500, Miami, FL 33131.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

## NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

## "Regarded as" coverage

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For more information, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.



Opening doors to the future℠

CONFIDENTIAL

Disciplinary Counseling Statement

| Associate Name: | Audra Mullins | Associate Position: | Afterhours Maintenance Call Center Tech |
|---|---|---|---|
| Associate ID #: | 109947 | Location and Area: | Dever Exec – Area 5 |
| Supervisor Name: | Javier Garcia | Supervisor Position: | Afterhours Maintenance Call Center Supervisor |
| CC: | Dan Thorp | | 03.11.2025 |

| Action Taken: | | |
|---|---|---|
| | | Coaching |
| | X | Documented Verbal |
| | | Written |
| | | Final Written |

**This Disciplinary Counseling Statement is being issued based on the following (select all that apply):**

| | | | |
|---|---|---|---|
| | Attendance/Punctuality | | Unsatisfactory Job Performance |
| | Conduct | | Safety Violation |
| | Timekeeping | | Insubordination |
| X | Company Policy/Procedure Violation | | Other: |

**Statement of Performance or Behavior:**

1. **What is the performance or conduct issue(s)?**
   - 03/03/24 Audra did not follow the legally required Federal Fair Housing procedures and initiated a conference call with a resident and their concierge.
     - UDR's policy is to provide the resident's phone number to the associate, who will then call the resident back. Connecting Residents and Associates directly is an enhanced communication service we are unable to provide all residents – so we cannot provide it to any.

2. **List the previous counseling sessions/documented conversations related to this issue(s).**
   - 02/04/25: Team meeting discussion and review of Fair Housing procedures. In the meeting it was stressed that UDR After-hour Maintenance Tech's must stay in compliance with fair housing procedures.

3. **What are the expectations for improvement?**
   - Immediately stop connecting associates and residents on conference calls.
   - Immediately cease returning resident calls with updates

ER – Counseling Statement Template
MA 7/21/2021

- Cease reaching out to Concierge for, on behalf of, as an intermediary between the resident and any working associate or contractor.

4. **What resources or support will be provided to assist the Associate in making the required improvement(s) (If applicable)**
   - Review the Maintenance Call Center Tech's job description and the policies in place ensure she/we are complaint with all the requirements under the Fair Housing law. This will be completed by March 17, 2025
   - If your supervisor is not available – the Assistant Supervisor can be contacted for any questions and concerns you have.

5. **How will successful improvement be measured?**
   - Immediately, cease connecting residents directly with UDR associates.
   - Weekly review of the Call Center Tracker for accuracy, completeness, timeliness, and detailed notes for the next 90 days. (Through 6/10/2025)
   - Weekly monitoring of all calls

**Employee Comments (optional):**

**You are formally being warned to bring to your attention the severity of this situation. Failure to correct this behavior and/or further violation of company policy will result in additional disciplinary action up to and including discharge.**

By signing below, you acknowledge that you have received this notice.

|  | Signature | Date |
|---|---|---|
| Associate: | *[signature]* | 03/17/25 |
| Supervisor: | | |
| Witness: | | |

*Forward a copy to HR for approval prior to discussion with associate.*

*Following discussion with associate, fax the signed counseling statement to 866-433-8370.*

ER – Counseling Statement Template
MA 7/21/2021

# Microsoft Teams Recording 2025-06-03 Transcribed

2025-06-03 Microsoft Teams meeting with Mr. Daniel Thorp, National Director of Facilities, and Ms. Susan Meader, Sr. HR Manager, transcribed.

**Microsoft Teams Recording 2025-06-03 Transcribed:**

(0:01) When I'm speaking with the managers, (0:04) when I'm speaking with, you know, (0:08) Javier, Remy, and Jakob, right? (0:14) When I'm speaking with them, (0:16) I know those aren't recorded. (0:20) When I'm speaking with the managers, (0:23) when I'm speaking with, you know, (0:27) Javier, Remy, and Jakob, (0:33) right, when I'm speaking with them, (0:35) I know those aren't recorded, right? (0:37) Those weren't recorded. (0:39) No, they're not.

(0:41) Yeah. (0:42) So that's why we ran into the issue (0:47) of what was going on in those meetings. (0:49) Like every day when I come to work on Monday and Tuesday, (0:53) those two days are my worst days to come to work (0:58) because it's always something (1:00) that he has an issue with me about (1:05) and no one else hears it, you know, (1:11) and it didn't stop.

(1:14) So I just didn't want to, you know, (1:17) and I wasn't going to go to HR or anything, (1:20) but it's when he started to threaten my employment (1:24) that I said, okay, I have to speak up (1:27) because if he doesn't like me, that's fine, (1:30) but I just want to be able to still keep my job, (1:33) do my job. (1:34) If I'm doing something wrong, you know, let me know, (1:37) but this has been since the beginning, since October. (1:40) So, you know, I would have thought (1:43) anyone would have a learning curve, (1:45) but I, and I think I did fairly decent (1:47) compared to, you know, the new guy that started after me, (1:53) and he's not treated that way, the way I was treated.

(1:55) So I think to be in this meeting, you know, (1:59) Harvey, I would have to tell you what he has done, (2:03) you know, for me to want to file, you know, (2:06) to, you know, file a complaint, you know. (2:10) Okay, can you give me some examples though? (2:13) I mean, discrimination is a pretty serious accusation, (2:16) which is why I wanted to have a conversation with you, (2:19) but I need some examples of what's going on.

(2:23) Well, that's why I was saying, (2:25) I would rather you talk to him (2:27) and let him tell you what has happened.

(2:31) I have spoken to him, and he doesn't know if (2:35) or how he was discriminated against you. (2:38) So the communications I've seen between him (2:40) and the rest of the team seem to be similar (2:42) to what I've seen him communicating with you (2:44) in that, you know, in the ones that are written (2:47) through Teams or through email. (2:49) So that's where I'm trying to get a better understanding.

(2:51) So maybe what we need to do is get you and him (2:54) and I on a call, and we can figure out at that point, (2:56) but I've got to figure out what's going on (2:58) because it's not something we can tolerate. (3:02) Okay, what do you mean? (3:05) Well, if he's discriminating against you, (3:08) I can't have that. (3:10) And if we can't find any sign of discrimination, (3:13) I need to figure out how we can get past (3:15) what we're dealing with now.

(3:19) Let me turn off my phone, I'm sorry. (3:24) I usually have, keep it on vibrate. (3:27) Okay, I want to ask, can I also record this meeting (3:32) if that's okay? (3:34) That's fine, I'll be happy to share the recording (3:36) with you when it's all done.

(3:37) Thank you, sir. (3:40) So like I said, I don't want to get anyone in any trouble. (3:45) It's a fairly easy job, right? (3:47) I come in, I, you know, set up my workstation (3:53) and I just wait for the calls, right? (3:56) And I dispatch, you know, and, you know, (4:01) there are certain situations where we have to ask questions, (4:05) but Javier has made it where I don't feel comfortable (4:09) asking questions.

(4:11) Like I feel like he's going to write me up for that, (4:13) or it's going to be another reason for him to say, (4:16) I don't know my job, or I didn't listen. (4:18) You know, like last night, he told me that I should have (4:25) reached out to the service manager for that particular issue (4:28) but for that particular issue, he told us to not reach out (4:32) to the service manager, that if a third party company (4:36) calls us and ask us to do something extra, (4:41) unless it's like water extraction, (4:43) where there's definitely another vendor (4:46) to call for water extraction, (4:48) he told us to have them speak to their supervisor, (4:51) their higher up to, so they'll contact the service manager (4:56) that they have the phone number (4:57) to the service manager direct. (5:00) And there's other things like, (5:02) don't call the customer back.

(5:05) If there's a fire department outside of a unit, (5:11) you know, outside of a client's unit, (5:15) do not call that resident. (5:19) But Yacob said to call the resident, you know, (5:23) that was one of those issues where, you know, (5:26) it comes up during that call

where something, (5:29) it's not going over in training, you know, (5:32) and, you know, Yacob, you know, he calls back his residents, (5:39) but on my end, when I'm speaking with Javier, (5:43) he says, it's a violation of fair housing, you know? (5:46) But when I tell the client, you know, the resident, (5:49) you know, or the vendor or someone, we can't do it, (5:52) we can't call the resident back (5:54) because it's a violation of fair housing, (5:56) he told me, don't say that, you know? (5:58) So it's like, I don't know what I'm, you know, (6:00) if I'm right or wrong or, (6:02) because he'll say things and then change it. (6:06) So those are some scenarios there (6:08) where one operator is doing it different, (6:12) than I am, you know, than what I was taught.

(6:16) And then I'm following their, (6:17) well, I wasn't taught anything about the, you know, (6:20) if the fire department is outside their door, (6:24) Yacob, you know, he calls his, the resident, right? (6:28) So I wasn't even aware of that situation, (6:32) but it came up where I called a resident back (6:35) for that same situation and Javier said, don't do that. (6:39) So recently about within the last two to three weeks, (6:44) a service manager asked, (6:47) well, why can't you call the resident (6:49) if the fire department is outside of their door, you know, (6:54) before they breach the door, you know, basically. (6:57) And I said that my manager said that we can't do that, (7:02) but I'll give you his name, you know, you can email him, (7:05) you know, his name is Javier, I'm sure you know Javier, (7:08) you know, so he and Javier, I guess, talked sidebar, (7:15) but that and the other situation was (7:18) when you emailed me that time, you had a complaint, (7:22) you thought that I spoke to another service manager (7:26) a certain way and I did not, I, you know, (7:30) I was only following what Javier told us to do at that time.

(7:34) And he changed that, you know, since that call, (7:37) he changed it, but he didn't take ownership and tell you, (7:41) you know, Mr. Thorpe, I do apologize, (7:44) I instructed her to handle those scenarios in that way. (7:48) So then I'm left on the chopping block with you (7:51) and you have no idea that he told me this and it's, (7:55) you know, so that is one scenario, (7:59) but it, you know, it's just the way that he treats me (8:02) when no one else is listening, you know, (8:05) and I told Ms. Meader before on several occasions, (8:09) Javier told me, no one should be talked to like that. (8:15) I wouldn't be surprised if you went to HR on me.

(8:19) And then the last two times he said something was, (8:25) no one should be talked to like that. (8:28) I am going to take myself to HR. (8:31) He said that on two separate occasions (8:34) and one of those occasions, he said, you know, (8:37) Audra, my grandfather died, I'm going through a lot, (8:40) you know, and so on and so forth.

(8:42) But he doesn't understand that we are his employees. (8:47) You know, I definitely try to do my best. (8:51) I finished my training early (8:53) to take a load off of his back.

(8:56) You know, I understand he's salaried (8:58) and I wanna make sure I can pull my weight and then some. (9:01) So I was doing overtime as much as possible. (9:04) Now I don't wanna even come in for overtime (9:07) because I'm afraid that that's one more day (9:11) that I have to face him, that he's going to, (9:14) you know, figure out an issue with me.

(9:17) You know, I really, I'm sorry to be talking like this, (9:22) but, you know, I'm just, I don't like confrontation (9:29) and I don't like having a bad impression. (9:32) And when you sent me that one email, Mrs. Thorpe, (9:35) I know that was a bad impression (9:37) and I don't want to be that way. (9:41) I'm honestly a hard worker.

(9:44) I've been in, you know, I'm an HVAC tech, (9:47) so I've been on the, you know, construction sites (9:50) and commercial warehouses and, you know, (9:55) grocery stores on roofs. (9:56) You know, I've done a lot of work around men. (9:59) So I've taken what Harvey has given to me countless times (10:04) over to the point of profanity.

(10:07) So I was taking whatever he was dishing out. (10:10) I was never going to go to HR, (10:14) but it's only when he started threatening my job. (10:18) So there was one Sunday where Remy said, (10:22) Audra, I need to record your calls.

(10:26) You know, basically it was because (10:28) they said I was slow on my calls, (10:31) but what I was actually doing was coasting. (10:34) Like if it's a day where I know the calls are slower, right, (10:39) I would spend a little bit more time, you know, (10:42) soothing the caller, making them feel better (10:44) because they are calling us about a problem. (10:47) And, you know, I was told I can't do that, (10:50) that I have to finish each call quickly.

(10:55) So I said, okay, but I also pointed out to her that day, (10:59) I compared my calls to Harvey's calls and Jakob's calls, (11:04) and I actually had done either more calls (11:07) or the same amount of calls that they had done (11:10) on a very, you know, on a busy day. (11:13) So I did not understand why he wanted her to record me, (11:18) but it was okay, you know, (11:19) but on my mind, it's like, okay, this is adding up now (11:23) because he said I was calling back customers (11:26) violating fair housing, you know, (11:31) and these are things he didn't tell me, you know, (11:34) about, you know, and other issues where, you know, (11:39) things have come up, you

know, (11:41) like he said things like, you don't know what you're doing. (11:46) Do you know your job? (11:47) You know, different things he said.

(11:49) And so I try not to make any mistakes. (11:53) And that's why sometimes I would ask certain questions (11:57) a second or third time in the chat to other people (12:01) just to get what they, you know, what he's told them, (12:04) because over time he'll change his methods (12:09) or he'll change how that job should be done, (12:13) case in point where the service manager reached out to you (12:17) because I was following what Javier told me. (12:20) No, you can't do this.

(12:22) And that was where I guess one of the texts, (12:29) it wasn't on the schedule, something like that. (12:33) And Javier told us to just go down the line (12:36) and that would be the next line, (12:38) I guess the service manager, you know, (12:41) and they'll have to correct the schedule (12:42) and they'll have to dispatch. (12:44) It's what he told us to do, (12:47) but he didn't tell you that.

(12:49) So I don't, I don't know. (12:51) And he wasn't here that day for me to, you know, (12:54) let him speak to the manager or, you know, to refer. (12:57) And it was just Jacob here and Jacob in the chat (13:01) stated that I did the right thing.

(13:03) So I don't understand, you know? (13:07) Okay. (13:08) So what I'm hearing is we have some grievances with policy, (13:13) but I still haven't heard the discrimination. (13:16) So I can, we can address policy disagreement.

(13:19) I'm happy to do that. (13:21) I'm trying to understand- (13:24) The discrimination in the hostile work environment (13:27) comes into play when he has me alone. (13:31) Like today is Tuesday, Mondays and Tuesdays.

(13:34) If you look at the call log in Teams, (13:38) you'll see the long calls where he and I (13:41) are in a meeting by ourselves. (13:43) Those are the times that he is yelling at me. (13:47) He's saying things that are not alignment with the job.

(13:52) And he's bringing me to actual tears. (13:57) He's talking down on me. (13:59) He's being discriminatory in a way (14:04) that he's not treating me the same as everyone else.

(14:09) And I have, I can't say I have proof (14:13) that he's treating other people differently, (14:15) but I've seen where Yacob has made mistakes (14:20) and Dustin has made mistakes and they were not chewed out. (14:24) They were not treated the

way that I was. (14:28) Yes, I was not suspended or, you know, (14:31) but I was written up for certain things like, (14:34) or a verbal warning for certain things.

(14:37) And so that's when I said, okay, (14:38) I need to work on saving my employment. (14:42) So it's what he does in our private meetings (14:46) that is hostile and, you know, not, (14:51) and it affects me, obviously the way I'm talking now, (14:55) it affects me at home, not just at work. (15:00) And he's going through his problems with his family.

(15:04) I have issues as well. (15:05) You know, everybody in my family depends on me, you know? (15:11) So I come into work and I try to do the best. (15:14) I can understand that.

(15:16) I thought, and I may have misunderstood, (15:18) I thought we had already arranged that conversations (15:22) between you and Javier would also include Remy (15:24) so as a third person there, is that not happening? (15:27) Well, the only reason I told him, I asked him, (15:31) how do I file a formal complaint? (15:36) It's because he wanted to message me in the private chat (15:41) and I wanted to stay in the group chat (15:45) so that they can see the flippant ways he talks to me, (15:49) you know, so that maybe he wouldn't talk to me that way. (15:51) Like he'll say, you should know that, (15:53) or just even just last night in the regular chat, (15:59) I mean, the way he said it, it was just, you know, okay. (16:05) But I mean, you have to be in those meetings (16:11) and that's why I ask everyone, (16:13) can I report now going forward? (16:15) Because he said those things.

(16:19) He said, no one should be talked to like that. (16:23) And if someone brings me to tear, (16:27) I'm a very feminine woman and I have all brothers, (16:33) they, you know, that's why I'm feminine. (16:37) That's how I know how to communicate with men (16:39) and not be, you know, not to say anything out of my mouth, (16:45) not be, you know, what do you call it? (16:48) When someone is like disobedient, not, you know, (16:52) I'm not that type of person.

(16:54) And so when someone treats me that way, (16:59) treats me badly the way he was, like if we were in person, (17:03) I felt like he would have hit me. (17:05) It was that much. (17:08) And I cried tears and he could hear that (17:14) and not running out my nose, everything, every time.

(17:19) And I don't know if it's something (17:22) he's got going on at home or he talks to women that way. (17:25) I don't know, but it's the things that he say (17:29) that, you know, was discriminatory. (17:33) And I even pointed out to Jakob, I was like, (17:36)

and I think Remy as well, (17:39) that if I was doing anything wrong, (17:41) that he would write me up for insubordination or something, (17:45) you know, to indicate to you guys that Audra (17:48) is not fit for this position, you know? (17:51) But he would say things to me.

(17:55) That's why I just say discriminatory, you know? (17:58) I just say hostile work environment and leave it at that. (18:03) But it's affecting me mentally. (18:06) It's affecting me emotionally at work and at home.

(18:11) And I would rather just fly under the radar, (18:16) just, you know, stay out of his way. (18:18) I try not to ask any questions, you know? (18:22) I try to just make it through my day. (18:25) And the only goal I have, you know, (18:28) is to just buy a house, you know? (18:31) So I'm just staying out of his way, you know? (18:34) And I can't- (18:35) Well, I would definitely not want you to feel (18:37) that you can't ask questions.

(18:38) That's the idea, that's how we grow in our positions. (18:40) We need to be able to ask so we can learn (18:42) and we continue to get better at what we do. (18:45) Right, and I love UDR.

(18:47) I looked up the company, I know what it's all about. (18:50) And I understand that, hey, I could possibly go (18:53) and work in the field with UDR or go, you know, (18:58) work in the office on the site or something else (19:01) or go to another state. (19:03) And I have a brother that just moved to Texas.

(19:06) So I have, you know, where I can, you know, (19:10) I like this company in that it gives me that flexibility. (19:14) I can look up for open positions. (19:16) And I don't wanna harm my record on the job (19:20) to do something like that as well, so.

(19:26) Nope, that's understandable. (19:28) What I was getting at is I want you comfortable enough (19:31) to ask so that you can learn and continue (19:34) to get better at what you do. (19:36) I don't know that I could, you know, (19:39) that I have witnessed anything along the lines (19:40) of him being discriminatory because you're a female.

(19:44) We have other women that work in the call centers too. (19:47) Jessica and Remy both, and they haven't experienced this. (19:51) So what I'm trying to figure out is what the driver is.

(19:55) And it doesn't seem that I can really pinpoint that. (19:59) The only example that I, I'm sorry. (20:05) I was thinking that he would have to be honest (20:07) with you guys that, of what he has said (20:10) and why he would have said, (20:13) no one should be talked to like that.

(20:16) I am taking myself to HR. (20:20) I wouldn't be surprised if you went to HR. (20:24) He has to be honest with you.

(20:26) He called me a while back and told me (20:28) that he acted unprofessionally on a phone call with you (20:32) and that he was trying, he was going to turn himself (20:35) into HR about it. (20:36) So he was honest enough to tell me, (20:38) he called me before I'd ever heard from anywhere else (20:39) that there was a problem there. (20:41) And like I said, I would not have gone to HR anybody (20:45) because I have dealt with people with mental health issues, (20:49) family issues and everything.

(20:51) You know, it's the only part was he was threatening my job (20:56) where Remy's watching me. (20:58) I knew my calls were being recorded before he revealed (21:01) they were being recorded, just little things. (21:05) And now when I think, okay, I'm doing great on these calls.

(21:10) You know, I'm fast, the residents love me when they call, (21:14) you know, then he'll say, well, you got to change this. (21:18) Now I got to be like him on the calls (21:20) and the residents are unhappy, you know, (21:22) and I don't want to lose my job for something like that. (21:25) You know, so I really am trying to keep my job (21:30) and do my job very well, you know.

(21:35) But that's all I want is to keep my job, you know. (21:39) I don't want anything else. (21:42) I can deal with his, I can deal with however he treats me.

(21:46) Trust me, I've been treated worse, okay. (21:50) But I don't want somebody to have to deal with something (21:55) that they're finding inappropriate. (21:58) I want to be able to address the problem.

(22:00) I'm still having a hard time pinpointing specific examples (22:05) and I'll go back through and review this call (22:07) and maybe I just missed, I mean, you have a lot of examples (22:10) of policy disagreements and that perhaps he's addressing (22:14) those problems a little bit differently with you (22:16) from the way you're perceiving it, (22:18) whether or not, I'm not wanting to say (22:19) whether that's accurate or not, because I'm not there. (22:21) I do know once we roll into funnel, (22:24) every phone

call will be recorded. (22:26) So it'd be a lot easier for me to go through (22:28) and review things myself on exactly (22:30) how that communication is going.

(22:32) But at this point, through the written communications (22:34) I've seen between Javier and all of the team members, (22:38) I haven't seen anything that varies (22:39) when he communicates with you. (22:41) But you've mentioned that it's in the verbal conversations (22:45) that is where you're finding those challenges. (22:49) So that's where I was under the impression (22:52) that anytime there was going to be a phone call (22:54) that we would have a third person on that call.

(22:56) So if that's not happening, I need to address that (22:59) and make sure that it does begin to happen again (23:00) so that there's another person there (23:03) that can bear witness to behavior. (23:05) Yeah, I was just asking if I can ask a question (23:09) in the group chat, not in the private chat, (23:12) because when I do that, he treats me different. (23:16) And it also helps the team if we can all understand (23:20) what questions each other have.

(23:22) Because if he's not here on Saturdays and Sundays, (23:24) I can ask everyone in the chat freely and they help. (23:30) And no one's saying, well, you should know that (23:33) and all these other things he adds on to it. (23:40) And you can actually coincide my Teams calls (23:43) with my Zoom calls to say, okay, (23:47) maybe this day is the reason he took her into a meeting, (23:49) but most of the time it was just training.

(23:52) It was just during our training or something like that. (23:56) I mean, that was one of the reasons (23:58) why I wanted to get a training early. (24:00) I wanted to finish early.

(24:03) And if he'll say certain things and I'll say, (24:06) yeah, I got it. (24:07) I got this, I'm just letting him know confirmation. (24:11) I got it, down pat.

(24:14) And then even with the way I wrote my notes, (24:19) he went off on me about that. (24:22) And so the way I write my notes is the exact same way (24:26) that Remy writes her notes. (24:29) So I have her format.

(24:30) She highlights the unit number in red and I do too, (24:34) because he went off on me. (24:37) He basically said, I didn't have the mental capacity (24:44) to write my notes and not forget to log a call, (24:53) not forget to dispatch, not to get behind. (24:58) You know, he assumed a lot of things (25:02) within my first couple of months here, you know? (25:06) And I think I did well, you know, (25:12) but I mean, he says I

do well, you know, (25:16) he gives me compliments, (25:18) but he'll take me into these meetings (25:20) and he will chew me out.

(25:23) I mean, and a lot of it really has nothing to do (25:27) with the job per se, you know, it was just personal life. (25:37) Yeah, here's what I would say at this point (25:40) is asking questions in the group chat is fine with me, (25:46) but be warned that if there is correction, (25:51) that means that he is gonna be correcting you (25:53) in front of a group, (25:54) which is something we don't typically like to do. (25:57) If there's something that we need to address (25:59) with a team member, we like to do that in private (26:01) because we're not trying to put everybody on full blast (26:04) of any problems that are out there.

(26:06) So if you're asking to have everything in group chat, (26:09) I will tell him that is exactly how it has to be, (26:12) but I need you to understand that that means (26:14) everything is going to be in group chat. (26:17) So if there's a problem, that's gonna put it out there (26:20) for everybody to know what's going on, right? (26:22) Are you okay with that? (26:23) Yes, sir, and just to give you another example (26:26) of why i prefer that is when he's private, (26:30) like I could be on the phone call (26:32) and he's messaged me several times within a few seconds. (26:37) So I'm on the call responding to what he's typing (26:41) and the caller and my notes, you know? (26:45) And before, you know, before that he complained (26:49) and say that I was not responding in the chat, you know? (26:53) And I was, I just didn't click like (26:56) because he didn't require that.

(26:58) What it was was Teams would notify them that, (27:02) hey, she has seen this. (27:03) So it would give them like a check seen, (27:06) but Jakob saw where my Teams, like I shared my screen (27:11) and he saw for himself that my Teams was not showing you (27:16) what it was showing me. (27:17) Like there was a glitch and there was a glitch (27:21) where Javier said, I was on a phone call too long.

(27:25) You have someone on hold like five or six minutes (27:28) or something. (27:29) I was like, no, I've actually been off that call (27:33) and have taken another call and I'm on another call. (27:37) So he's messaging me while I'm on this other call (27:40) backwards and forwards.

(27:41) Yeah, you're on that call. (27:42) Yeah, it shows you on hold or whatever he's putting there. (27:46) And it's several times, several calls.

(27:50) And it's usually when no one's here. (27:53) Usually it's the first two hours of Monday and Tuesday. (27:58) And you know.

(28:01) Well, I don't know if Teams is gonna end this call (28:04) automatically at 2.30. (28:05) I'm not sure if that's how it works. (28:07) I'm just adapting to it. (28:08) No, I just wanted to warn you if it shuts it off.

(28:10) That's why I don't know if it does it or not. (28:12) Zoom allows me to go over, but we're not on Zoom anymore. (28:15) Yes, sir.

(28:15) But a lot of the correspondence is in the Teams chat. (28:21) If you read it as a flippant way, he's saying it, (28:27) the way he talks to me in these meetings, it's way worse. (28:32) And you may see Teams as not being bad, (28:35) but if you're on a call and someone's messaging you back, (28:40) like we're having a conversation just as fast in the chat (28:44) as I am on that call, you know? (28:47) And you know, he's like, (28:50) well, why did you call the service manager? (28:52) Why did you dispatch? (28:55) Or why didn't you call? (28:57) And then most of the time I've done it the right way.

(29:02) Most of the time I've done it the right way. (29:05) Or if I ask a question, he'll read it wrong. (29:08) Like yesterday he did it.

(29:10) He read a question wrong, you know? (29:13) And I don't know if he's just reading ahead (29:17) or just thinking, you know, answering my question (29:20) before I, you know, some people can do that. (29:23) And, but it's written, it's in chat, you know? (29:27) And then there's been sidebars that I've taken with Remy (29:32) or Remy has seen, okay, maybe he didn't understand her (29:36) or maybe she didn't understand him. (29:38) And she'll, you know, step in and type something.

(29:42) And I'm like, Remy, you hit, you know, (29:45) the nail on the head, you know? (29:48) So I don't know. (29:51) It's just, he just, (29:53) so that's the only reason I want it in the regular chat (29:57) because other people.

*Exhibit E*



CONFIDENTIAL

Disciplinary Counseling Statement

| Associate Name: | Audra Mullins | Associate Position: | Afterhours Maintenance Call Center Tech |
|---|---|---|---|
| Associate ID #: | 109947 | Location and Area: | Dever Exec – Area 5 |
| Hire Date: | 10/01/2024 | | |
| Supervisor Name: | Javier Garcia | Supervisor Position: | Afterhours Maintenance Call Center Supervisor |
| CC: | Dan Thorp | | 07.10.2025 |

| Action Taken: | | | Coaching |
|---|---|---|---|
| | | | Documented Verbal |
| | | | Written |
| | | X | Final Written |

**This Disciplinary Counseling Statement is being issued based on the following (select all that apply):**

| | Attendance/Punctuality | | Unsatisfactory Job Performance |
|---|---|---|---|
| | Conduct | | Safety Violation |
| | Timekeeping | | Insubordination |
| X | Company Policy/Procedure Violation | | Other: |

**Statement of Performance or Behavior:**

1. **What is the performance or conduct issue(s)?**
   - 07/05/25: Associate (Audra) acknowledged an update in the Teams chat from a co-worker and subsequently disregarded the instructions.
     - 07/05/2025 1:06 p.m.: An update sent to the Teams Chat about a specific call (reference call number/name)
       - The update said the Service Manager was handling the call.
     - 7/5/2025 2:12pm: Audra responded to another call from the same caller on the same issue and reached out to the vendor, disregarded the Teams message she previously acknowledged she had read.



- 07/07/25: Associate (Audra) acknowledged an update in the Teams chat from her manager and subsequently disregarded the instructions
  - 07/07/2025: 2:00pm PST: Team chat communicated the following re: 1200 East West from Service Manager Elmer
    - "We wanted to bring to your attention to the building issue we had today affecting the building water. We are sending a notice to the community for steps in how to reset their HVAC system also for any discoloration in their water to run it for a couple of minutes. Please walk the residents through these steps as well before dispatching Paramount Construction."
  - 07/07/2025: 2:09pm PST: Audra received a call from 1200 East West for an A/C not working. Audra reached out to the vendor Paramount disregarding the standard direction of having the caller contact the location – as the office was still open.  Additionally, she disregarded the above direction she had previously acknowledged in the chat.



2. **List the previous counseling sessions/documented conversations related to this issue(s).**
   - 12/10/2024: Discussed the importance of keeping work notifications update in Microsoft Teams.   Sent follow up email acknowledging conversation on 12/10/2024
   - 12/13/2024: We gave Audra a written warning on this issue.
   - 03/11/2025 Documented verbal for Violation of Company Policy and Procedure
   - 07/01/2025:  Written Warning – Violation of Co. Policy and Procedure and Insubordination

3. **What are the expectations for improvement?**
   - Follow procedures and directions give to associate through a variety of resources: spreadsheet, information shared in the chat
   - Fewer deployment mistakes
     - Acknowledge all updates on Microsoft Teams and when acknowledging updates, ensure that they are read and the information provided is communicated and utilized in her day to day conversations.

4. **What resources or support will be provided to assist the Associate in making the required improvement(s) (If applicable)**
   - Review the job and system requirements of making work notifications in Microsoft Teams at the weekly review.
   - Any questions to reach out to Remi if Javier is not available.

5. **How will successful improvement be measured?**
   - Calls and deployments will be monitored in real time – feedback given in real time as well.
   - Associate demonstrates her ability to make work notifications in Microsoft Teams one time each week for the next 3 weeks
   - Monitor activity in Microsoft Teams.

- o   Acknowledge updates and information in Microsoft Teams
  - o   Updates and information provided in Microsoft Teams is applied/utilized to answer future calls and questions.
- Fewer deployment mistakes

**Employee Comments (optional):**

**You are formally being warned to bring to your attention the severity of this situation. Failure to correct this behavior and/or further violation of company policy will result in additional disciplinary action up to and including discharge.**

By signing below, you acknowledge that you have received this notice.

| | Signature | Date |
|---|---|---|
| Associate: | | |
| Supervisor: | | |
| Witness: | | |

*Forward a copy to HR for approval prior to discussion with associate.*

**Following discussion with associate, fax the signed counseling statement to 866-433-8370.**

ER – Counseling Statement Template
MA 7/21/2021

# Microsoft Teams Recording 2025-08-05 Transcribed

Microsoft Teams Recording 2025-08-05 Termination Meeting with Ms. Susan Meader and Mr. Javier Garcia, transcribed.

**Microsoft Teams Recording 2025-08-05 Transcribed:**

(0:04) So I thank everybody for joining on the call. (0:07) So Audra, we have you here today (0:08) because we have to let you know (0:10) that we're terminating your employment (0:13) with UDR effective immediately. (0:16) This is a decision based on the ongoing issues (0:19) we've had over the several months.

(0:22) We are willing to see if you wanna input (0:25) your resignation for two weeks. (0:28) We will be willing to accept that (0:30) if you would like to do that. (0:34) Okay, I don't understand why I'm being terminated.

(0:37) If you could just help me out understand that. (0:42) Audra, we're terminating your employment (0:44) and the reasons for that are multiple (0:46) and we just need to move forward. (0:48) And so the decision that you need to make (0:50) is whether or not you want to resign (0:52) and put in your resignation letter (0:54) or just let us terminate you based on the issues (1:00) that we've had with you (1:01) and have reviewed with you in the past.

(1:03) Remy, I think you were gonna sort of give Audra (1:08) the information about what a resignation would look like. (1:12) Yes, yes, so Audra, (1:14) so the difference between doing a resignation (1:17) or termination, so resignation, (1:19) we would have you write an email (1:20) letting us know that you're resigning. (1:22) You are still gonna be done (1:25) with the appointment starting today, (1:27) but UDR is willing to pay you for the resignation (1:33) for those two weeks (1:34) and also you'll be able to get (1:40) that any remaining unused PTO (1:43) added to your paycheck as well.

(1:46) So technically your last day will show as August 19th, (1:50) but today is your official, (1:53) you will be stopped working starting today. (1:57) Yes, and I just wanted to know (1:59) why I'm being terminated, that's all. (2:03) Because we have made the

decision (2:05) that you're not a good fit for the organization, (2:09) both from a performance perspective (2:10) and that we've talked to you about that (2:13) and have decided that it's time for us to move on (2:17) as well as you.

(2:20) Okay, so I have been in contact (2:24) with different attorneys regarding the issues (2:27) that I've had with- (2:29) And that's fine, Audra, (2:31) you can continue to contact them, (2:33) but what we really need to do on this call (2:36) is to move forward with the decision we've made (2:42) to terminate your employment (2:43) and find out if you would like to resign or be terminated. (2:47) And again, we're open to whatever you would like to do. (2:49) So that's the decision that's in front of us.

(2:52) Yes, ma'am. (2:53) Is there a way I can get it in writing (2:55) the reason I'm being terminated? (2:58) We don't provide that in writing, so no. (3:02) Okay.

(3:04) And if you resign- (3:05) Was there something I did wrong? (3:06) If you resign, there would not be a reason for, (3:09) we wouldn't give you a reason either (3:11) because again, you made the decision that you, (3:14) it's time for you to leave the organization (3:16) and do something different. (3:19) Yes, ma'am. (3:20) Was there something I did wrong? (3:22) Audra, it's time that we just need to move forward (3:24) with what it's best to do next.

(3:27) And so I don't think going and talking about (3:31) you know, conversations we've had in the past (3:33) or, you know, what, you know, (3:37) worked and didn't work for both UDR and you, (3:41) I think we just need to move forward with that decision (3:44) which is in front of you on whether or not you wanna resign (3:47) or whether you want to be terminated. (3:51) Yes, ma'am. (3:51) I was just asking because I did, (3:54) Javier put me on a final written or final warning written (3:58) and I never got explained on that either.

(4:03) So I was just wondering, was this because of that write-up (4:07) or I don't understand, you know, (4:10) I was just trying to figure out what I did wrong. (4:12) Yeah. (4:12) Well, I think that, you know, at this point in time (4:16) it's most important to focus on what's ahead of us (4:19) and ahead of you.

(4:20) And that is again, to make a decision (4:22) whether or not you want to resign (4:24) or you want us to terminate you. (4:25) We've made the decision that we need to part ways. (4:30) Yes, ma'am.

(4:31) I was just wondering what was the reason, (4:33) but, you know, I would have to speak to my attorney (4:38) to find out what they would like me to do, if that's okay.

(4:43) You can do that if you'd like, which is fine. (4:46) We do need a decision from you (4:48) on whether or not you're gonna be terminated or resigned (4:51) because it makes a difference (4:52) on how we process your final paperwork.

(4:56) And so we certainly can, what is it, 3.30. (5:00) So we would need your decision by tomorrow at noon, (5:05) whether or not you want to resign or be terminated (5:09) because we have to, you know, finish that paperwork. (5:11) So if you want to resign, (5:13) then you can send your resignation letter to er at udr.com. (5:18) And I will be looking for that and receive it. (5:21) And then I can work with Javier and Remy (5:24) to process the termination as a resignation on your part, (5:28) as opposed to a termination.

(5:31) So again, welcome to talk to folks about that. (5:35) She said, if I resign, what is the pay? (5:40) Like, because I have like 50 hours. (5:43) Right, exactly.

(5:44) And so that's an advantage to you financially for resigning, (5:47) if that's what you decide to do. (5:50) With a resignation, as in all resignations, (5:52) you let us know today that your last day of employment (5:55) will be two weeks or longer, (5:58) and two weeks would be the 19th of August. (6:00) And if you do put that in writing to us, (6:03) we'll accept that resignation (6:05) and then grant you an opportunity (6:07) to leave the organization immediately today, (6:12) but still pay you through the 19th.

(6:15) And then with a termination reason of resignation, (6:19) UDR's policy is to pay out NE earned but unused vacation. (6:25) And that is reflective, I think, (6:27) when we check of about 50 to 60 hours. (6:30) So with a resignation, you would have pay (6:35) from UDR for about four weeks.

(6:38) And so that is a financial advantage (6:41) for choosing to resign as opposed to being terminated (6:44) since you're being given that opportunity. (6:47) The other piece is that for your next position, (6:51) again, the reason that you left UDR (6:54) is because you chose to leave the organization, (6:57) not that the organization asked you to leave. (6:59) And so it certainly becomes sort of a supporter (7:04) and an easier explanation for why you left the organization (7:08) and something that we would verify (7:11) if a future employer would come (7:15) and check on why you left the organization.

(7:18) If you resigned, it would be for resignation (7:20) as opposed to an involuntary termination. (7:26) Yes, ma'am. (7:27) I have a question.

(7:29) I do see that sometimes you guys hire (7:31) at other locations, like on-site. (7:35) I know they need maintenance. (7:37) Is it possible I can apply to one of those positions? (7:41) You certainly can apply if you'd like.

(7:45) Again, if you resign. (7:46) So if you terminate me, I can't? (7:47) That's correct. (7:51) And you say I have until when to decide? (7:54) Yeah, again, we're just giving you an opportunity (7:56) to resign until noon tomorrow, (8:00) because otherwise, again, it's an option.

(8:04) We're giving you an option to resign. (8:05) If you choose not to, which is fine, (8:08) then we'll terminate your employment. (8:10) If you choose to resign, that's fine too, (8:13) and we would be happy to process (8:17) your leaving the organization as a resignation.

(8:22) Yes, ma'am. (8:23) So do I work my rest of my shifts today? (8:26) You do not need to. (8:28) So you can sign off as soon as this conversation is over, (8:35) and then Javier and Remy will take care (8:38) of shutting down your access (8:40) so that you aren't expected to do any more work today.

(8:46) Yes, ma'am. (8:47) Could I have this recording, a copy of this recording, (8:51) so I can give it to my attorneys, please? (8:54) Well, let's first decide whether or not (8:55) you're gonna resign or be terminated. (8:57) I think that that's the first decision (8:59) that needs to be made.

(9:00) It is recorded, so we do have it. (9:04) Okay, thank you. (9:06) So I just sign out.

(9:09) What about the laptop and everything? (9:12) Yeah, that's something, again, (9:13) when you send me your resignation letter or not, (9:18) or let me know you're not going to, (9:20) I will follow that up with coordinating with you (9:24) to return your equipment. (9:26) We will send you packaging information (9:30) so that you can just send it under (9:33) and return it to us, and we'll pay for it. (9:36) So it's just coordinating, putting that equipment (9:40) in packaging such that it can be returned to UDR.

(9:48) Yes, ma'am. (9:50) Any other questions? (9:51) Just one last one, just go ahead. (9:54) Yes, ma'am.

(9:55) Is your email and phone number (9:58) in our HRAS system correct? (10:01) So that would be the best way to get ahold of you? (10:04) Yes, ma'am, that's correct. (10:06) It's still the same. (10:07) Okay, good.

(10:08) Good, all right. (10:08) If you had a question, I interrupted you. (10:13) I was just wondering, what I did wrong, that's all, (10:17) but you said I could, if I don't, (10:20) if I resign, I can apply for another job, (10:25) just someplace else.

(10:26) Mm-hmm. (10:27) Can I check on that today? (10:29) Like, I don't think I did anything wrong. (10:35) I did my best.

(10:36) I did everything right. (10:39) I did way better than a lot of people that just started. (10:42) Okay.

(10:43) Well, that's certainly your perspective, (10:45) and that's fine if that's what you think. (10:49) That's not what we think. (10:51) But again, you know, from our perspective, (10:56) need to move forward, as well as do we, (10:58) and so, you know, with a resignation, (11:01) you have that opportunity to move forward (11:04) with, in essence, a neutral reference from UDR.

(11:08) And so, again, it's really up to you to decide (11:10) what it is you, or how you want to position (11:13) the time you work for UDR as it fits into your overall, (11:18) you know, employment history, your, you know, next job. (11:23) Ms. Susan, so you say I can apply for another job (11:28) at UDR, it just can't be the call center. (11:30) Is that fine? (11:31) That's correct.

(11:33) Okay. (11:37) And I have until 12 noon, (11:38) so that's 3 p.m. my time tomorrow? (11:43) Yeah, mm-hmm. (11:44) I'm gonna just use my time.

(11:45) So, 12 noon, which would be 3 p.m., (11:48) or was it 2 p.m.? (11:49) I think it's 2 p.m., (11:50) because you're on East Coast time, right? (11:52) Yes, ma'am, I'm East Coast. (11:55) All right, so I will look at your- (11:56) You said I email HR. (11:58) Email er at udr.com. (12:02) E as in Edward, R as in Romeo.

(12:04) Correct. (12:05) At UDR. (12:07) And I will, I'll send you an email (12:10) with that information as well (12:11) at the email address that you have in our system.

(12:14) So, again, you have a way to connect with me. (12:18) Yeah. (12:18) If you could just give me a hint on what I did wrong, (12:22) that's all, you know, if it's just that,

(12:25) okay, Javier is, you know- (12:29) Audra, Audra, I can appreciate your need for that, (12:32) and I totally respect that, (12:34) but that's not something that we share with people (12:37) who we're asking to leave the organization.

(12:40) And again, in some senses, it doesn't matter exactly, (12:43) because what you need to do (12:45) and we need to do is to move forward. (12:47) So, talking about the past and what worked (12:49) and what didn't work in the past (12:51) isn't really productive for going forward. (12:56) Yes, ma'am.

(13:00) Okay, so look for an email from me, (13:02) and then we can stay connected for what you decide to do (13:06) and then for returning your equipment. (13:09) Yes, ma'am. (13:10) Okay.

(13:10) All right, well, thanks so much. (13:11) Thanks, Javier. (13:12) Thanks, Remy.

(13:13) We'll talk to you later. (13:15) Thank you, Susan. (13:16) Uh-huh, bye.

(13:18) Bye.